[No. A133121. First Dist., Div. Two. Apr. 16, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
ROSA PUI HILL et al., Defendants and Appellants.

**COUNSEL**

John Francis McCabe II, under appointment by the Court of Appeal, for Defendant and Appellant Rosa Pui Hill.

Law Offices of Robert J. Beles, Robert J. Beles, Paul Gilruth McCarthy and John Patrick McCurley, for Defendant and Appellant Mei Yuk Li.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Seth K. Schalit, Sharon R. Wooden and Dorian Jung, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEWART, J.—**

## I. INTRODUCTION

The crimes alleged in this matter arose out of a custody dispute between estranged spouses Rosa Pui Hill and Eric Hill. Appellants Rosa Hill and her mother, Mei Li, appeal from the judgment following their conviction by a jury of the first degree murder of Selma Hill (Eric Hill's grandmother) and the attempted premeditated murder of Eric Hill. Mei Li was also convicted of first degree burglary of Selma Hill's residence.[1]

On appeal, Mei Li raises several claims of instructional error. Rosa Hill argues the trial court erred in admitting her pretrial statement and failing to answer a question from the jury during deliberations. She also raises claims of prosecutorial misconduct and ineffective assistance of counsel. Both appellants argue the evidence was insufficient to support the attempted murder conviction and cumulative error. Each appellant joins in the arguments of the other pursuant to California Rules of Court, rule 8.200(a)(5). Finding merit to one of Mei Li's claims of instructional error, we will reverse her conviction for the murder of Selma Hill.[2] We affirm the judgment in all other respects.

---

[1] A third codefendant, Ping Li (Rosa Hill's father and Mei Li's husband), was also charged in this matter. His case was severed from the trial of the other two defendants. In her opening brief, Rosa Hill states that he pled guilty to violations of Penal Code sections 32 and 459, and was sentenced to four years' imprisonment.

[2] Shortly before oral argument in this matter, Mei Li's counsel submitted a letter drawing to the court's attention two cases filed after briefing was complete, *People v. Chiu* (2014) 59 Cal.4th 155 [172 Cal.Rptr.3d 438, 325 P.3d 972] and *People v. Smith* (2014) 60 Cal.4th 603 [180 Cal.Rptr.3d 100, 337 P.3d 1159], which address the natural and probable consequence theory of aiding and abetting. At oral argument, we set a schedule for supplemental briefing regarding

## II. FACTUAL AND PROCEDURAL BACKGROUND

On November 17, 2009, the Alameda County District Attorney filed an information against Ping Li and appellants Rosa Hill and Mei Li.[3] Count one charged Rosa and Mei with the murder of Selma, in violation of Penal Code section 187, subdivision (a).[4] In connection with count one, the information alleged the felony-murder special circumstance that Rosa committed this offense in the course of a burglary, within the meaning of section 190.2, subdivision (a)(17),[5] and that Rosa and Mei were armed with firearms within the meaning of section 12022, subdivision (a)(1).

Count two charged Ping and appellants Rosa and Mei with the premeditated attempted murder of Eric, in violation of sections 187, subdivision (a), and 664, subdivision (a). In connection with count two, the information alleged that Rosa personally used a firearm within the meaning of sections 12022.5, subdivision (a), and 12022.53, subdivision (b), and that Ping and Mei were armed with firearms within the meaning of section 12022, subdivision (a)(1).

Count three charged Ping and Mei with residential burglary of Selma's home, in violation of section 459.[6] In connection with count three, the information alleged that Ping and Mei were armed with firearms within the meaning of section 12022, subdivision (a)(1).

On March 5, 2010, the trial court granted Rosa's motion to set aside the special circumstance allegation.

On March 7, 2011, the trial court granted Ping's motion to sever.

Rosa and Mei were tried together by a jury between March 16 and June 28, 2011.

these two cases. Having now reviewed those briefs, we agree with the parties that, under *People v. Chiu*, the jury in this case was erroneously instructed on aider and abettor liability for first degree murder under the natural and probable consequences doctrine. However, in light of our reversal of Mei Li's first degree murder conviction on another ground, as explained herein, we need not address the parties' contentions regarding *Chiu*.

[3] Because several individuals involved in this matter share the same last names of Hill and Li, in the interests of clarity and readability, we will hereafter refer to them by first names; no disrespect is intended.

[4] Unless specified all further statutory references are to the Penal Code.

[5] We note that the information alleged the underlying felony of burglary but cited to section 190.2, subdivision (a)(17)(A), which specifies the underlying felony of *robbery*. The parties raise no issue in this regard; thus, we will presume, as they apparently did, that subdivision (a)(17)(G), specifying *burglary*, was intended.

[6] Rosa was not charged with a separate count of burglary.

## A.  Prosecution Case

### 1.  Eric and Rosa

Eric and Mei both worked at the Alameda County Social Services Office in Oakland as eligibility technicians. Mei introduced Eric to her daughter, Rosa, in late 2002. Eric and Rosa began seeing each other in early 2003 and married in April 2005. They lived with Mei and Ping in Antioch for four or five months before purchasing a condominium in Fremont. They had a child together, a daughter, E.H., who was born in June 2006.

Upon Eric's return to work from paternity leave, supervisors complained about his job performance. Eric believed his work was adversely impacted by medication he took to control his mental illnesses, which included severe depression, visual and auditory hallucinations, and suicidal tendencies. His symptoms became worse when he stopped taking his medication.

Eric had a history of mental problems dating back to high school. In 2004, after Rosa saw Eric put a knife to his wrist, he took time off work and went to a Kaiser intensive outpatient program (IOP) designed to deal with depression and associated suicidal thoughts. His treating psychiatrist, Dr. Cohen, advised Rosa to supervise Eric and to remove all knives and sharp objects from the home. In 2005, Eric had a breakdown at work and was driven to the emergency room by his supervisor. He was placed back in the IOP. In 2007, Eric was not in therapy but spoke to Dr. Cohen on the phone from time to time. By the time of trial in 2011, Eric self-reported that he was not on any medication and was feeling fine.

In early 2007, Eric and Rosa were having problems in their marriage; they separated in March. Eric moved out and went to live with his grandmother, Selma, in Dublin. Rosa had custody of E.H. after the couple separated. Eric initiated legal proceedings for full legal and physical custody in May 2007 after being informed by Carolyn Lacativo of Child Protective Services (CPS) that she thought Rosa was a danger to E.H. due to Rosa's paranoid tendencies and erratic behavior. Rosa accused Eric of molesting E.H.; Eric denied the allegations.

The Alameda County Family Court assigned Dr. Phillip Montes, a psychologist, as the mediator in the case. The court ordered both Rosa and Eric to undergo psychiatric evaluations by Dr. Randall Kolin. At the next hearing, the court split legal and physical custody equally between Eric and Rosa. During the year and a half of custody litigation, Eric complained to Dr. Montes about Rosa, including that she disrupted daycare, did not put E.H. in daycare as instructed, was overfeeding E.H. and that she did not return her on

time after Thanksgiving. By August 2008, Eric had physical custody of E.H. 85 percent of the time and 100 percent legal custody.

In January 2009, Eric and E.H. were living with Selma, who was 91 years old and in declining health. She was approximately five feet tall, "heavy," and had poor eyesight. She had difficulty moving around and she sometimes used a walker to maintain her balance. Selma was romantically involved with Lester Rowe, and would spend Thursday until Sunday at his condominium in Fremont. Lester was 90 years old and dying of bladder cancer. Lester regularly called Selma at 4:00 p.m. on the days they were not together.

2. *Events of January 7, 2009*

On January 7, 2009, Eric and E.H. left the house around 7:00 a.m., before Selma woke up, and Eric went to work after dropping E.H. at daycare.

Shortly after 5:00 p.m., Lester telephoned his son and daughter-in-law, Jeffrey and Ute Rowe. He explained that he had been trying to reach Selma by telephone for the last hour, and it was very unusual that she had not answered. Lester was very upset. Jeffrey and Ute agreed to drive to Selma's residence to check on her. They arrived around 5:30 p.m. and found nothing unusual. Ute knocked and rang the doorbell several times, while Jeffrey checked the backyard. Finding nothing, they agreed to wait for Eric to arrive.

Eric and E.H. arrived shortly before 6:00 p.m. Jeffrey and Ute introduced themselves to Eric and explained why they were there. They all went into the house through the garage, with Eric carrying E.H. in his arms.

Jeffrey and Ute waited in the family room while Eric carried E.H. upstairs. When Eric went into his grandmother's room, he saw Mei crouching near the closet. He felt confused and worried because Mei should not have been there; she did not have a social relationship with Selma.

Eric asked Mei what she was doing there. She stood up but did not answer. Eric put E.H. down and asked where his grandmother was. When Mei said Selma "was out shopping," Eric knew something was not right. Then he asked Mei how she got into the house. Mei said she came "through the door in the garage." Eric "got scared" and "thought something may have happened to" Selma. He "started running towards the garage."

As Eric hurried toward the stairs, "Rosa ran out of the baby's room and charged" toward him. She wore a dark jacket and a black ski mask. He felt a bump on the back of his head and heard popping noises. He fell down in the hallway and the two women hit him all over his body. Rosa used a hand-held

stun gun to stun Eric repeatedly in the legs and lower back, while Mei hit Eric with a baton. Eric yelled, "Help, Jeff, help."

Downstairs, Jeffrey and Ute Rowe heard two or three popping noises, followed by Eric screaming, "What are you doing? What are you doing?" Worried that they had heard gunshots, they ran next door to the home of a neighbor, who called 911. Jeffrey, Ute and the neighbor went back to Selma's house, where they heard more popping sounds. The neighbor heard Eric screaming, "Wait. Wait. Wait."

Meanwhile, Eric felt blood dripping down his face and he realized he was in a fight for his life. He testified that in 2009, he weighed 265 pounds and that Rosa and Mei each weighed around 100 pounds. Eric stood up and pushed Mei away, but Rosa knocked him down again. He was hit multiple times with stun guns. Eric managed to get the baton and was hitting someone with it. He kicked Rosa into the baby's room, but she came out again and hit him with the stun gun while telling him to shut up and stop moving. At this point, Eric saw that Rosa was holding a gun to his chest. He stopped fighting and lay still on the floor. Mei pushed the baton down on Eric's throat and began choking him. Both Mei and Rosa insisted that Eric give up custody of E.H. They demanded, "Are you going to give up [E.H.]? Will you give up [E.H.]? Can Rosa have [E.H.]?" Eric agreed to give [E.H.] to them because he did not want to die.

At that point, Eric heard sirens outside. Rosa ran to the window while Mei held the baton to his throat. Rosa returned to the bedroom doorway, pointing her gun at Eric. He could hear police officers in the house.

Deputies of the Alameda County Sheriff's Office arrived at Selma's house at 5:53 p.m. They heard screaming and yelling from inside the house and a male voice saying, "Please don't kill me. I don't want to die. Please don't."

The deputies went upstairs with their weapons drawn. They found Eric on his knees in the hallway. Mei was bleeding from the head and standing near unspent bullets, an "electronic stun device" and a "collapsible baton." Eric suddenly darted into a bedroom, and Deputy Daniel Molleson deployed his Taser to incapacitate him. Deputy Jared Hattaway ordered Mei to drop to her knees and raise her hands. Deputy Hattaway heard Eric shouting that Mei and Rosa had a gun and that his two-year-old daughter was in the house. Hattaway asked Mei where the child was, but she did not respond. When he asked her again, she pointed to a bathroom. Looking into a mirror on the bathroom wall, Hattaway saw the reflection of Rosa, "standing very still," in a nearby bedroom. Hattaway ordered Rosa to come out of the bedroom with her hands raised. She complied. Hattaway discovered a second electronic stun device in that bedroom. He found E.H. crying in the bathroom.

Deputies removed Rosa and Mei from the residence and searched them. Rosa was wearing a long black coat with mud and dirt on it and multiple layers of clothing. A small, unloaded black handgun was found in her jacket pocket. Mei was wearing a heavy tan coat and black pants. She told an officer she had a stun gun in her pocket, which was removed. Mei was taken to the hospital and treated for her head wound.

Deputy Mitchell Mensinger located Rosa's father, Ping, slouched down in the driver's seat of a gray Prius that was parked across the street and several houses down from Selma's house. The vehicle was registered to Ping. Inside the Prius, Mensinger found a pink and black backpack belonging to Mei which contained her business cards, her driver's license, a flashlight, a red wig, pepper spray, a headlamp and directions to Selma's house.

Officers also found a black backpack with no identifying information in Selma's backyard near the fence. It contained a pocket saw, packaging tape, a Master long-cast fishing reel, a rope, crossbow arrows, a knife, a pry bar and .22-caliber ammunition.

Criminalists of the Alameda County Sheriff's crime lab processed the crime scene. Numerous items were retrieved from the upstairs area of the house, including unfired .22-caliber bullets, a Taser, a knife within a sheath, latex gloves, a duty belt, a retractable baton and a stun gun.

Deputies searched the backyard and found no evidence of a struggle. They cut the padlock on a storage shed. Inside the shed, they found Selma's body in a garbage can. The body was wrapped in blue sheets. There were plastic grocery bags on the body's head, neck and hands; a white rope was wrapped around the body.

Selma's autopsy revealed blunt injuries to the head and neck area, along with "heat effect" wounds on the right hand, arm and torso that could have been caused by a Taser. The pathologist testified that the cause of death was asphyxiation due to strangulation associated with multiple blunt injuries.

### 3. *Police Investigation*

Deputies impounded Rosa's Acura Integra, which she had parked near Selma's home. Deputy Scott Busby searched the vehicle and found a crossbow, a crossbow bolt, a box of .22-caliber bullets and packaging for a glass cutter. A black dufflebag contained numerous items including handcuffs/leg irons, pepper spray, a hacksaw, a camping axe, a pry bar and a rubber mallet. Deputy Busby also found a blue coin purse containing $2,000

in cash, an envelope holding another $432.06 and a samurai sword with "a holding strap of the kind commonly used to carry over your shoulder."

On January 8, 2009, deputies executed a search warrant on a residence in Antioch. They found mail addressed to Mei, Ping and Rosa, and recovered a computer and a .38-caliber revolver registered to Ping. Deputy Andrew Brosi, a computer forensics expert, analyzed the computer and found, under a user account labeled "Mei Li," Internet searches for the terms "taser gun, stun guns," "gun silencer" and "how to break into a house."

Deputies determined that Mei and Ping maintained a second residence. On January 20, 2009, deputies executed a search warrant on a residence in Brentwood. Inside, they found indicia that Mei and Rosa resided in the home, including bills and a pay stub in Mei's name and job applications in Rosa's name. In the kitchen, deputies found printed documents and handwritten notes. One Internet printout contained information on chloroform and "poisons and antidotes." Other printouts were titled "Medications That Can Cause Confusion in Elderly Persons" and "Medications That Should Be Avoided If Possible When Certain Diseases Are Present." In one notebook, there were recorded movements of vehicles, including Eric's, at Selma's residence, as well as the time the garage door opened. Rosa later testified that she "was interested in the company that Eric was keeping."

In the dining room of the Brentwood residence, deputies found handwritten notes, several of which were read for the jury: "Crime equals desire, ability, opportunity. [¶] Flashlight . . . as a weapon to hit at forehead, wrist, critical PTS that they cannot hit back. Knuckles can do the job. [¶] Palm to chin, down to up, low to high, go back to neck, that tall person may fall back. [¶] Ask . . . in a strong voice, the other party may feel compelled to answer. [¶] Pepper spray . . . does not work on everybody. Tear gas, a guy says give me more." Another handwritten note contained references to "angel of death trial," "toxicology," "arsenic," "traceless death" and "poison tablet."

In the master bedroom/bathroom, deputies found indicia in Mei's name. They also found notes for a "revenge spell" against "Eric Hill, Gregory Hill, Selma," and a note that referred to "Eric Hill and Selma Hill" as "troublemakers."

Deputy Brosi analyzed the hard drives of several computers seized from the Brentwood residence. He found Internet searches for "traceless suicide," "poison death by touch," "homemade silencer," "how suicide," "strychnine" and "cyanide." There were also Internet searches for "how to murder," "gun shows," how "to get away with murder," "punishment for murder" and "how to strangle."

A Verizon Wireless cell phone analyst examined the cell phone records of Rosa's, Mei's and Ping's cell phones. Rosa's cell phone made a series of 10 calls to Mei's cell phone from 11:46 a.m. to 5:15 p.m. on January 7, 2009. Mei's phone connected through cell towers in Oakland until 5:05 p.m., at which point the remaining calls (at 5:05 p.m., 5:11 p.m., 5:12 p.m. and 5:15 p.m.) were processed through towers in Dublin and Pleasanton.

A criminalist working for the sheriff's office and qualified as an expert in DNA testified that she tested the Taser and the baton found upstairs in Selma's house. The contributing DNA sample taken from the Taser barb could not exclude Selma. The baton sample had a mixture of DNA present that included at least two sources; the majority was consistent with Eric's DNA and the minority was consistent with Mei's DNA. Rosa, Ping and Selma were all excluded from the baton samples.

An employee from Taser International testified that in order to activate a Taser, the individual must pass an online or telephone background check and the name on the credit card used to pay the activation fee must match the name used for the background check. Two Tasers were activated in Mei's name on December 24, 2008. The Taser employee could not tell whether the background check was conducted online or over the telephone. Mei's supervisor testified that Christmas Eve was a scheduled work day for Mei. Rosa testified that she activated the Tasers in Mei's name because she purchased the Tasers for Mei. An employee from the Antioch Armory testified that two Tasers and pepper spray were sold to an older Asian couple on December 24, 2008.

Robert Spellacy, who sold guns at a Reno, Nevada, gun show in October 2008, testified that he sold a .32-caliber gun to Rosa and Mei in a private sale for $200 in cash. A .32-caliber revolver was recovered from the trunk of the Acura.

B. *Defense Case*

Rosa testified that she was born in Hong Kong and lived there until the age of 11, when her family immigrated to the United States. She grew up in San Leandro and graduated from the University of California, Davis with a degree in applied mathematics. She had no prior criminal record.

1. *Rosa and Eric*

She met Eric in October 2002. During a trip to Yellowstone in May 2003, he exhibited aggressive behavior and had panic attacks. She tried to break off the relationship several times, but he would cry and say he could not live

without her. During one of these events in June 2004, Eric put a knife to his wrist. She told him he had to get help, and she took him to see Dr. Peter Cohen, a psychiatrist at Kaiser.

Dr. Cohen testified that he first saw Eric in June 2004. Eric had been cutting himself for three weeks prior to the appointment, and had previously tried to eat or drink himself to death. He complained of depression and suicidal feelings. Dr. Cohen recommended inpatient treatment, but he agreed to an intensive outpatient program and prescribed Prozac after Rosa agreed to monitor Eric and to remove sharp objects from the house. Eric saw Dr. Cohen in February 2005; he reported that he had been doing fine until he got the flu and stopped taking Prozac, at which time his symptoms got worse and he experienced visual and auditory hallucinations.

Rosa and Eric were married in April 2005. During their honeymoon, Eric stopped taking his medication so he could drink alcohol. He became angry and had outbursts. That summer, Eric's supervisor took him to the emergency room because of a mental breakdown. Eric was hospitalized briefly. Dr. Cohen noted that he was off Prozac and his hallucinations returned, although Dr. Cohen did not consider him suicidal. Eric returned to the IOP.

The couple's daughter E.H. was born in June 2006. Later that year, Eric stopped taking his medication because he did not want to fall asleep at work. His supervisor wanted to terminate him, so Mei suggested he contact his union representative. In early 2007, he met with union shop steward Ruth Levin, who helped him avoid losing his job.

During this time period, Rosa began to notice that when she shared a meal with Eric, she would become extremely drowsy and pass out. She had no symptoms when she prepared the meal herself, and feared that Eric was putting medication in her food. In March 2007, Eric told her that he heard voices telling him to push children into traffic. Rosa was very worried and told Eric to talk to Dr. Cohen. On March 13, Eric admitted to Dr. Cohen that he was hearing voices that told him to hurt people. Eric was diagnosed with major depression recurrent with psychotic features.

Several incidents in early 2007 led Rosa to believe that Eric was molesting E.H. Rosa awoke one night and saw Eric with his hand down E.H.'s diaper. Another time, Rosa saw a cut on the baby's chest. Eric said he had been changing her. When Rosa tried to talk to him, he walked away. The next day, they took E.H. to Rosa's parents' house. When Mei gave the baby a bath, she noticed that her vaginal opening was unusually large and there was discharge. There were times when Eric was holding E.H. on his lap and he had an erection.

Rosa saw her primary care physician, Dr. Quin Huffman, in March 2007. She told Dr. Huffman that she suspected Eric of putting medication in her food. A urine toxicology screen was negative for codeine. She also told the doctor she suspected Eric of sexually abusing E.H. Dr. Huffman told Rosa that she was required by law to report the matter to CPS. Dr. Huffman also contacted Kaiser Social Services, advised Rosa to take E.H. to her pediatrician and referred Rosa to a Kaiser crisis counselor.

The crisis counselor advised Rosa to contact Eric's psychiatrist and make an urgent appointment with her pediatrician. She also reported the matter to CPS. The individual she spoke with at CPS was Ruth Levin.

Levin did not immediately recognize Eric as the person she had assisted as a shop steward, but she did realize it at some point. Levin screened the call and classified the case as emotional abuse rather than sexual abuse because the report did not come from the child or a witness to sexual abuse. She assigned the case to Carolyn Lacativo and Levin's involvement in the case ended.

Rosa moved with E.H. to her parents' home in Antioch. Rosa reported the abuse to the Fremont police department, which recommended that she take E.H. to Children's Hospital for an exam. Dr. Rachael Gilgoff, a child abuse pediatrician, examined E.H. on March 29, 2007. The exam was normal, but Dr. Gilgoff testified that this did not rule out sexual abuse.

The Fremont police investigated but concluded there was not enough evidence to pursue the case.

Lacativo from CPS testified that she was concerned about E.H. when she heard the allegation that Eric had experienced recent hallucinations telling him to push children into the street. She interviewed Rosa and was told by the Fremont police that there was no evidence to prove that Eric had molested E.H. Lacativo also testified that Rosa was not cooperative with her investigation. It was difficult to get Rosa to meet with her. She learned that Rosa was living with her parents, but Rosa and Mei refused a home visit. Finally, Lacativo met with Rosa, Mei and E.H. at the social services office in Hayward.

Rosa testified that she thought CPS was biased against her because Levin had helped Eric with his demotion at work. Rosa said she had trouble contacting Lacativo, not the other way around, and that Lacativo was very upset that Rosa wanted to meet her at her office rather than at her parents' home.

When Eric and Rosa separated in March 2007, Rosa retained custody of E.H. Eric testified that he began legal proceedings to obtain custody after

Lacativo called him and told him she considered Rosa a danger to E.H. because of her paranoid tendencies and erratic behavior. Lacativo denied she said that to Eric. Lacativo admitted, however, that she and Rosa had a hostile relationship and that Rosa had filed a formal complaint against her.

In the custody matter, at some time prior to June 21, 2007, the court issued a restraining order that gave Rosa sole legal and physical custody and ordered that Eric have no contact with E.H. On July 31, 2007, Eric was granted temporary sole legal and physical custody for one week. On August 7, the court ordered joint legal and physical custody, awarding 50 percent to each parent. On February 13, 2008, the court increased Eric's custodial time and decreased Rosa's. Minor changes to custodial time were made in May and August 2008; the court gave Eric sole legal custody in August 2008. The matter was set for trial in November 2008. Trial was then reset for February 2009.

The court generally followed the recommendations of its mediator, Dr. Phillip Montes. In turn, Dr. Montes relied on data provided by Lacativo. As the case progressed, Dr. Montes recommended that Eric have greater physical custody because he was convinced that Rosa had mental health problems. Dr. Montes concluded from the Fremont police report that Eric did not molest E.H.

Rosa tried unsuccessfully to convince Dr. Montes that she did not have a mental illness. Randall Kolin, Ph.D., conducted psychological evaluations of both Rosa and Eric in August 2007 at the request of the court. Dr. Kolin found that Rosa was overwhelmed with stress and anxiety but there was no indication of paranoia. Dr. Kolin found that Eric had a severe impairment in his reality testing; he advised the court that Eric might be experiencing some psychotic symptoms.

In an August 31, 2007 report, Lacativo stated that she considered E.H. to be safe with Eric, but she remained concerned about Rosa's mental status. Lacativo concluded that Rosa was making false allegations against Eric to alienate E.H. from him.

Between June 2007 and April 2008, Rosa saw Dr. Carrie Kelley Skarda, a psychologist at Kaiser in Antioch.[7] Dr. Skarda thought Rosa was stressed but had good judgment and insight. Upon learning that Dr. Montes thought Rosa was delusional, Dr. Skarda sent him a letter stating that Rosa was not suffering from a delusional disorder. On her own initiative, Rosa underwent a psychological evaluation at Portia Bell Hume Behavior Health Center in April

---

[7] Rosa discontinued seeing Dr. Skarda when the doctor moved away from California.

2008. The evaluators concluded that Rosa had an adjustment disorder, and they ruled out any delusional disorder or paranoia.

Rosa thought that by seeing Dr. Skarda and undergoing the evaluation at the Portia Bell Hume Center, she was in full compliance with the court's wishes. Rosa felt that, instead of protecting E.H., the court process was hurting her and it was taking a toll on Rosa as well. When E.H. would cry out, "No, Daddy, no," in the middle of the night, Rosa thought E.H. was still being abused. Yet, the mediator continued to reduce her amount of physical custody of E.H. Dr. Montes had concerns about Rosa spending three hours a day at the daycare center; he believed this interfered with what the court had designed as a safe place for E.H. According to Dr. Montes, because of Eric's susceptibility to depression, it was crucial that the stability and support provided by the daycare center be maintained. Dr. Montes asked the court to ban Rosa from the daycare center and that she be arrested if she appeared there.

After Rosa was prohibited from seeing E.H. at the daycare center, she missed her terribly. E.H. seemed scared and reluctant to leave Rosa at the end of her visits. Rosa started to panic and worried that Eric might have a psychotic breakdown and hurt E.H.

On the weekend preceding January 7, 2009, Mei told Rosa that E.H. pointed to the area between her legs and said "owie" and that "Daddy did it." E.H. told Rosa she did not want to go see her Daddy. When Rosa returned E.H. to Eric after that weekend, E.H. was shaking badly and whispered in Rosa's ear, "Help me, Mommy." Rosa was panicking over what would happen to E.H. while in Eric's care.

2. *Events of January 7, 2009*

Early on the morning of January 7, 2009, Rosa awoke from a nightmare in which E.H. was screaming, "no, Daddy, no." She felt compelled to go and check on her safety. She left the house, taking with her a gun, a stun gun, and a Taser in case Eric became violent. She drove to Selma's house in Dublin, parked around the corner, and climbed onto a second-story balcony. She testified that when she looked in the window, she saw both Eric and E.H. lying naked on a futon. Eric was fondling her and had an erection.

Rosa was not sure what to do. She climbed down from the balcony and rang the doorbell but there was no answer. She did not call the police because she could not prove what she saw. She testified that she was "just so emotionally overwhelmed that I couldn't leave E.H. with Eric anymore." She saw Eric leave for work.

Rosa went into the backyard and heard Selma open the door on the side of the garage. Rosa thought Selma was unaware of what Eric was doing and that, if she knew, she would help protect E.H. Rosa talked to Selma, and the two women went into the garage through the side door. Rosa told Selma about the molestation, hoping that Selma would withdraw her financial support from Eric. Selma responded that Eric was E.H.'s father and that he could do whatever he wanted. Rosa was shocked, upset and angry.

Selma grabbed what looked like a knife or a box cutter and appeared to swing it at Rosa, pointing it toward her face. Rosa grabbed a broom and hit Selma several times with it. She testified that, "I got really angry. I lost it." Rosa "Tased" her and shoved her with the broom. Selma fell back and started gagging. Rosa used a stun gun to see if Selma would move, but she did not.

Rosa was in shock. She telephoned her mother but did not reach her until about 3:00 p.m. Rosa also tried to call her pastor but got only his voicemail. Rosa wrapped Selma's body in sheets and then moved it by herself to the shed in the backyard by using boards to place the body onto a dolly. Rosa put the body into the garbage in the shed and padlocked the door. The key to the padlock was found on Rosa's utility belt. Rosa decided to wait until Eric got home to see if she could convince him to let Mei take care of E.H.

Rosa testified that when Mei arrived at Selma's house around 5:25 p.m., Rosa met her at the side entrance, but did not tell her what had happened to Selma. Rosa told her mother that she needed her to watch E.H. while Rosa tried to talk to Eric about custody. When Eric arrived, Rosa was upstairs. She heard him talking to her mother. Rosa testified that, when she came out of the bathroom into the hallway, Eric charged her. She was scared and "Tased" him, but it had no effect. He grabbed Rosa and started banging her head into the floor. Mei tried to pull him off of Rosa, and Rosa was able to reach the stun gun and stun him. Eric grabbed the baton and hit Mei in the head with it. Rosa testified that at some point Eric had a gun.

At that point, E.H. ran into the hallway, and Rosa picked her up, moved her to the far corner of the bathroom, and closed the door. As the struggle continued, Rosa tried to talk to Eric about having E.H. stay with her mother, but she was distracted by the sound of sirens.

Rosa testified that she did not go to the house with the intention of killing Selma or Eric. She gave a statement to the police that night because the officers told her that if she did not talk to them, she would never see E.H. again. Rosa told the police that Mei had "Tased" Eric. She admitted at trial that not everything she told the police was true.

On June 28, 2011, the jury convicted both Rosa and Mei of one count of first degree murder and one count of premeditated attempted murder. The jury

also convicted Mei of one count of first degree burglary. The jury found the firearm enhancement allegations were true as to Rosa but not true as to Mei.

On August 29, 2011, the trial court sentenced Rosa to consecutive prison terms of 25 years to life plus one year on count one and life with the possibility of parole plus 10 years on count two. The court sentenced Mei to consecutive terms of 25 years to life on count one and life with the possibility of parole on count two, and stayed a four-year sentence on count three. Appellants filed timely notices of appeal.

## III. DISCUSSION

A., B.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Whether the Trial Court Correctly Instructed on Aider and Abettor Liability for Felony Murder*

Mei contends the trial court erred in failing to instruct the jury that she could not be guilty of felony murder if she did not aid and abet the burglary or kidnapping until after Selma was already dead.[9] Respondent argues that the instructions were in fact correct; the evidence did not support such an instruction; and Mei waived any such instruction by failing to request it.

Here, the trial court instructed the jury on general principles pertaining to felony murder and aiding and abetting.[10] Specifically, the trial court instructed on first degree felony murder pursuant to CALJIC No. 8.21 as follows: "The unlawful killing of a human being, whether intentional, unintentional or accident, which occurs during the commission or attempted commission of the crime of kidnapping and/or burglary is also murder of the first degree when the perpetrator had the specific intent to commit that crime. [¶] The specific intent to commit kidnapping and/or burglary and the commission or attempted commission of that crime must be proved beyond a reasonable doubt." The trial court instructed on aider and abettor liability for felony murder pursuant to CALJIC No. 8.27: "If a human being is killed by

---

[*]See footnote, *ante*, page 1100.

[9] Regarding the allegations against Mei, the prosecution charged her in count three with burglary based presumably on her own entry into Selma's house. On the murder charge, count one, however, the prosecution proceeded inter alia on the felony-murder theory that Mei was an accomplice to Rosa's uncharged burglary (the earlier entry into Selma's house) or uncharged kidnapping.

[10] The trial court also instructed the jury on conspiracy as a theory of liability. Mei does not challenge the conspiracy instructions; thus, we need not address them here.

any one of several persons engaged in the commission or attempted commission of the crime of kidnapping and/or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of the murder [*sic*] of the first degree, whether the killing is intentional, unintentional, or accidental."

Mei argues that the court should have instructed the jury with the third, optional paragraph of CALJIC No. 8.27, which provides: "[In order to be guilty of murder, as an aider and abettor to a felony murder, the accused and the killer must have been jointly engaged in the commission of the (felony)_____ at the time the fatal [blow was struck] [wound was inflicted].]" (CALJIC No. 8.27.)

This provision is derived from *People v. Pulido* (1997) 15 Cal.4th 713 [63 Cal.Rptr.2d 625, 936 P.2d 1235] (*Pulido*), which addressed the "scope of complicity" in felony murder, framing the question presented thusly: "If one person, acting alone, kills in the perpetration of a robbery, and another person *thereafter* aids and abets the robber in the asportation and securing of the property taken, is the second person guilty of first degree murder under section 189?" (*Id.* at p. 716.) The court answered the question in the negative, explaining that the second person is an accomplice to robbery but is not liable for the murder "because the killer and accomplice were not 'jointly engaged at the time of such killing' in a robbery [citation]; the killer, in other words, was not acting, at the time of the killing, in furtherance of a 'common' design to rob." (*Ibid.*)

*Pulido* involved a defendant who testified that he and the codefendant were driving around, stopped at a gas station, and the codefendant went inside while the defendant waited in the car. Upon hearing a gunshot, the defendant ran into the store and saw the codefendant with a gun and the gas station employee's body on the floor. The defendant went back to the car; the codefendant followed, carrying a cash register which he dumped on the defendant's lap. As they drove away, at the codefendant's direction, the defendant pried open the register, gave the money to the codefendant, and discarded the register by the side of the road. (*Pulido, supra*, 15 Cal.4th at p. 718.) The court concluded that aiders and abettors who join a felonious enterprise only after a killing has taken place, so-called "late joiners," are not liable for the earlier homicide. (*Id.* at pp. 725–726.)

In *Pulido*, the Supreme Court did not reach the issue of whether the trial court had a sua sponte duty to instruct regarding a late-joining accomplice

because the defendant could not demonstrate prejudice from the asserted error. (*Pulido, supra,* 15 Cal.4th at p. 726.) The factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under another instruction, the robbery-murder special-circumstance instruction. (*Ibid.*) By returning a true finding on the special circumstance allegation, the jury necessarily found the defendant was engaged in the robbery at the time of the killing. (*Id.* at pp. 726–727.)

To provide guidance in future cases, however, the *Pulido* court discussed the standard jury instructions in the context of robbery as the underlying felony: "These standard instructions are correct in general; when, however, substantial evidence would permit the jury to find the defendant began aiding and abetting an enumerated felony only after the killing occurred, they may require modification, or qualification with a special instruction. Unmodified, CALJIC No. 8.27 appears to tell the jury that an aider and abettor in an enumerated felony, without any temporal or causal qualification, is liable for first degree murder in a killing committed by anyone else engaged in the felony. In combination with [CALJIC No. 9.40.1, concerning the duration of a robbery], CALJIC No. 8.27 could well suggest to a jury that a person who aids and abets only in the asportation phase of robbery, after the killing is complete, is nonetheless guilty of first degree murder under the felony-murder rule. As we have seen, that implication would be incorrect." (*Pulido, supra,* 15 Cal.4th at p. 728.)

Mei argues the trial court erred in failing to instruct the jury pursuant to paragraph three of CALJIC No. 8.27, the "complicity instruction," because, without that point of clarification, the jury could have found Mei guilty of felony murder even if she did not aid and abet any underlying felony committed by Rosa until after Rosa killed Selma.

Respondent contends that Mei was not entitled to the complicity instruction because it was not supported by the evidence. Respondent relies on the Use Note to CALJIC No. 8.27, which provides that the complicity instruction "should only be given if a defendant contends he or she did not aid and abet until after the fatal blow was stricken." (Use Note to CALJIC No. 8.27 (Spring 2013 ed.) p. 587, citing *Pulido, supra,* 15 Cal.4th 713.) Respondent points out that this was not Mei's theory at trial. Rather, in her testimony, Rosa repeatedly distanced Mei from any involvement and insisted that Mei knew nothing other than that Rosa wanted her to watch E.H. so she could talk to Eric. Mei's counsel argued to the jury that Mei only struck Eric when she saw him attacking her daughter. Presumably in reliance on the Use Note, Mei asserts multiple times in her briefs that she did not aid and abet Rosa until after Rosa killed Selma, and that this was her theory at trial.

■ The parties' focus on appellants' theory at trial is misplaced. Although the use note bases applicability of the instruction on a defendant's *contentions* at trial, our reading of *Pulido* indicates that the court was focused, rather, on whether *substantial evidence* could support a jury finding. Regardless of appellants' contentions at trial, there was substantial evidence from which one or more jurors could conclude that Mei was not present when Rosa killed Selma and that Mei's "joint engagement" in the commission of burglary and/or kidnapping did not arise until after Selma was already dead. There was evidence that Rosa arrived at Selma's house early that morning, that Selma was killed early in the day, and that Mei did not arrive at Selma's house until after 5:00 p.m. for the purpose of watching the child so Rosa could talk to Eric.[11]

A similar situation was present in *Pulido*, where the defendant claimed he participated in the robbery only under duress or after reaching a place of temporary safety, not that he intentionally assisted in the robbery only after the killing. (*Pulido, supra*, 15 Cal.4th at p. 726.) Nowhere in *Pulido* does the court base its conclusion on the defendant's contentions or theory at trial, as opposed to substantial evidence from which the jury could conclude that he was a "late joiner." (See *id.* at pp. 726–728 [noting that when "substantial evidence would permit the jury to find the defendant began aiding and abetting an enumerated felony only after the killing occurred . . . ," the standard jury instructions may require modification].) We suggest the Use Note to CALJIC No. 8.27 could more precisely articulate this point.

Respondent argues that, even if the instruction could properly have been given, it merely pinpoints a theory of the defense and Mei waived the instruction by failing to request it. Mei acknowledges that she did not request the instruction; she contends the trial court had a sua sponte duty to give it.

■ In criminal cases, a trial court must instruct sua sponte on the " ' "general principles of law relevant to the issues raised by the evidence," ' " that is, those principles " ' "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) By contrast, " 'pinpoint' " instructions "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they

---

[11] There was also evidence that would have supported the opposite finding—that Mei knew of and participated in Rosa's plans prior to the commission of the murder and was "jointly engaged" in the scheme throughout. But it was up to the jury to make that determination which, in the absence of the *Pulido* instruction, i.e., paragraph three of CALJIC No. 8.27, it was prevented from making.

are not required to be given sua sponte." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

As noted previously, the *Pulido* court did not decide whether the trial court had a sua sponte duty to instruct regarding the timing of an accomplice's participation in the underlying felony relative to the killing because the special circumstance finding necessarily resolved the issue against the defendant. (*Pulido, supra*, 15 Cal.4th at pp. 726–727.) However, the *Pulido* court's statement that the evidence "may require" such an instruction, albeit dicta, certainly suggests that a sua sponte duty could exist, depending on the evidence. (*Id.* at p. 728.) Here, the special circumstance allegation was stricken after the preliminary hearing, and there is no argument that any other instructions given to the jury supplied the missing finding regarding the timing of Mei's participation in the underlying felony.

The only case we have found that holds a trial court has a sua sponte duty to instruct on this issue is *People v. Esquivel* (1994) 28 Cal.App.4th 1386 [34 Cal.Rptr.2d 324] (*Esquivel*), which predates *Pulido*. In *Esquivel*, the defendant was convicted of felony murder based on his participation in the underlying robbery as an aider and abettor. (*Id.* at pp. 1389, 1393–1394.) Esquivel and two other men were at the home of an acquaintance when one of the men attacked and killed the acquaintance. Various items of personal property were stolen from the acquaintance's home, including guns that were found at Esquivel's home. (*Id.* at pp. 1390–1391.) Esquivel argued on appeal that the trial court "erred in failing to instruct the jury sua sponte that if [he] became an aider and abettor to a robbery after the victim had already been fatally wounded, he could not be found guilty of felony murder." (*Id.* at p. 1392.) The Court of Appeal agreed and reversed his conviction, holding Esquivel could not be liable for murder under a felony-murder theory if he formed the intent to aid and abet the robbery after the murder was committed and the jury should have been instructed accordingly. (*Id.* at pp. 1396, 1401.)

The *Esquivel* court also held that the trial court had a sua sponte duty to instruct on the timing of his intent to participate in the underlying felony. (*Esquivel, supra*, 28 Cal.App.4th at pp. 1398–1399.) Analogizing to the law of conspiracy, *Esquivel* relied on *People v. Marks* (1988) 45 Cal.3d 1335 [248 Cal.Rptr. 874, 756 P.2d 260], in which the court stated, ". . . 'A conspirator cannot be held liable for a substantive offense committed pursuant to the conspiracy if the offense was committed *before* he joined the conspiracy. [Citations.] The trial court, however, did not instruct the jury that it must find defendant joined the conspiracy before the murder. A trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.] There was evidence suggesting that defendant did not join the alleged conspiracy until after the murder.' "

(*Esquivel, supra,* 28 Cal.App.4th at pp. 1398–1399, quoting *People v. Marks, supra,* 45 Cal.3d at p. 1345.) The *Esquivel* court also found that no instruction informed the jury that Esquivel, as an aider and abettor, had to have formed the intent to participate in the robbery before the murder was committed in order to be found guilty of felony murder. This amounted to a failure to adequately inform the jury of the relevant legal principles, as to which the trial court had a sua sponte duty to instruct. (*Esquivel, supra,* 28 Cal.App.4th at p. 1399.)

Our Supreme Court's recent case of *People v. Wilkins* (2013) 56 Cal.4th 333 [153 Cal.Rptr.3d 519, 295 P.3d 903] (*Wilkins*) also bears on whether the trial court in this case had a sua sponte duty to instruct regarding the timing of Mei's participation in the underlying felony for felony-murder liability. In *Wilkins*, the defendant burglarized a home under construction, stole several large appliances, and drove away with them in the bed of a pickup truck. (*Id.* at p. 338.) As he was driving, a stove fell off the truck onto the freeway. Another driver alerted the defendant, but he left it on the freeway and continued to drive. (*Id.* at pp. 338–339.) Subsequently, another motorist swerved to avoid the stove, crashed his vehicle, and was killed. (*Id.* at p. 339.) The defendant was convicted of first degree murder on the felony-murder theory that the motorist's death occurred in the commission of a burglary. (*Id.* at p. 340.)

At trial, defense counsel requested an instruction that, for purposes of felony murder, the burglary continues until the perpetrator reaches a place of temporary safety, also known as the "escape rule." The trial court refused the instruction, and the Court of Appeal affirmed. (*Wilkins, supra,* 56 Cal.4th at pp. 337–338, 341.) The California Supreme Court, however, reversed, based on its determination that the defendant's requested instruction was legally correct and supported by substantial evidence, i.e., evidence that the defendant was 62 miles from the scene of the burglary when the stove fell off his truck, he had been driving for about an hour, and there was no evidence that anyone was following him or was even aware yet of the burglary. Thus, the jury could have concluded that the defendant had reached a place of temporary safety before the fatal collision occurred, in which case the murder did not occur *while the killer was engaged in* the felony. (*Id.* at pp. 347–348.) The critical inquiry for applicability of the felony-murder rule, the court explained, is "whether the murder was 'committed *in the perpetration of*' the felony. (Pen. Code, § 189, italics added.)" (*Id.* at p. 346.)

The parties in *Wilkins* disagreed on whether the failure to instruct on the escape rule amounted to misinstruction on an element of the offense, in which case the federal harmless error standard applied, or a refusal to give a pinpoint instruction, a state law error. (*Wilkins, supra,* 56 Cal.4th at

pp. 348–349.) The *Wilkins* court concluded that the federal harmless error standard applied because the instruction the trial court gave "was—in absence of an instruction on the escape rule—incomplete and misleading." (*Id.* at p. 349.) The court explained: "[T]he jury was told that it could consider '[w]hether the fatal act occurred while the perpetrator was fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime.' Nothing in the instruction, however, informed the jury that there was any rule it must apply in determining whether the felony and the fatal act were part of one continuous transaction or in determining whether defendant's flight had ended. . . . Under these instructions, even a juror who believed that defendant had reached a place of temporary safety before the fatal act occurred would have no reason to conclude that he or she must find the defendant not guilty of first degree murder. The instructions given, therefore, amounted to misinstruction on an element of the offense of first degree murder. Accordingly, the federal harmless error standard applies." (*Id.* at pp. 349–350, fn. omitted.)

In the instant case, the instruction the trial court gave on the scope of aider and abettor liability for felony murder was incomplete and misleading in the same way the instruction in *Wilkins* was incomplete and misleading. Here, in the context of evidence that Mei, an alleged aider and abettor, was not present at the scene when the victim was killed, but arrived later, the instruction failed to advise the jury that, to be liable for felony murder Mei must have been jointly engaged in the commission or attempted commission of the underlying burglary and/or kidnapping at the time the fatal blow was dealt. (See *Pulido, supra,* 15 Cal.4th at p. 729; CALJIC No. 8.27.) The instructions that were given provided no guidance to the jury on the timing of Mei's aiding, promotion, encouragement or instigation by act or advice, of Rosa's commission of the burglary and/or kidnapping. (See *Esquivel, supra,* 28 Cal.App.4th at pp. 1398–1399.) Under the instructions as given, a juror who believed that Mei's aiding and abetting the burglary and/or kidnapping began after Selma was already dead, such as when Mei arrived at Selma's house, "would have no reason to conclude that he or she must find [Mei] not guilty of [felony] murder." (*Wilkins, supra,* 56 Cal.4th at pp. 349–350.) Thus, the trial court here had a sua sponte duty to instruct the jury that felony-murder liability does not attach to a defendant who aids and abets the perpetrator of the crime only after the killing. (See *Pulido, supra,* 15 Cal.4th at pp. 726, 729.)

Not surprisingly, the parties disagree about the effect of an instructional error here. Mei contends the federal harmless error standard applies because the error amounts to misinstruction on an element of the offense. She further contends that the standard is not met and reversal is required. Respondent argues, assuming error, it was harmless under any standard based on "overwhelming evidence" that Rosa and Mei acted together in planning and

preparing to commit the felony that resulted in Selma's death. Respondent also argues that the evidence overwhelmingly supported a conviction under a theory of premeditated malice murder based on the evidence of computer searches for poisons, other methods of killing, and how to get away with murder as well as evidence of their actions on the day of Selma's death.

We agree with Mei that the federal harmless error standard applies here. A trial court's misinstruction on an element of an offense is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Wilkins, supra,* 56 Cal.4th at pp. 348–350; *People v. Flood* (1998) 18 Cal.4th 470, 503–504 [76 Cal.Rptr.2d 180, 957 P.2d 869]; *Esquivel, supra,* 28 Cal.App.4th at p. 1399.) "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201 [91 Cal.Rptr.3d 106, 203 P.3d 425]; see *People v. Flood, supra,* 18 Cal.4th at p. 504.) The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 113 S.Ct. 2078].) Phrased another way, the error is harmless only "[i]f other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary" for a valid first degree murder theory. (*People v. Chun, supra,* 45 Cal.4th at p. 1205.)

Here, under the instructions given, the jury could have convicted Mei of first degree murder on a felony-murder theory either on the inference that she aided and abetted Rosa's burglary and/or kidnap at the time Selma was killed or on the inference she began aiding and abetting Rosa after Selma was killed.[12] The instructions did not require the jury to decide whether Mei was aiding and abetting *at the time of Selma's death*; no other aspects of the verdict or the evidence eliminate reasonable doubt that the jury made that necessary finding. (See *People v. Chun, supra,* 45 Cal.4th at pp. 1204–1205.) Although the jury clearly disbelieved appellants' theory that Mei knew nothing and was completely uninvolved upon entering Selma's house, as evidenced by the jury's separate burglary verdict against Mei, the jury nevertheless could have believed that Mei's involvement did not constitute aiding and abetting until after Selma was killed. On this record, we are unable to conclude beyond a reasonable doubt that the error did not contribute to the verdict. (See *id.* at p. 1201.) Thus, the error was prejudicial.

---

[12] The jury was also instructed on conspiracy principles and first degree murder as a "willful, deliberate and premeditated killing with express malice aforethought."

Our determination that Mei's murder conviction must be reversed renders it unnecessary for us to consider her other claims of instructional error regarding the murder charge.

D.–I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.  DISPOSITION

Mei's conviction for first degree murder is reversed, and the matter is remanded for further proceedings consistent with this opinion. In all other respects, the judgments are affirmed.

Kline, P. J., and Richman, J., concurred.

A petition for a rehearing was denied June 12, 2015, and on May 13, 2015, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 26, 2015, S227035.

---

*See footnote, *ante*, page 1100.